# United States Court of Appeals
## For the First Circuit

No. 21-1227

JOHN DOE,

Plaintiff, Appellant,

v.

STONEHILL COLLEGE, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Gelpí, Lipez, and Howard,
Circuit Judges.

Timothy C. Woodcock, with whom Janna L. Gau and Eaton Peabody were on brief, for appellant.

Christopher M. Iaquinto, with whom Philip J. Catanzano, Timothy D. Andrea, and Holland & Knight LLP were on brief, for appellee.

December 14, 2022

**LIPEZ**, **Circuit Judge**.    John Doe was expelled from Stonehill College for violating its sexual misconduct policy by engaging in "nonconsensual sexual intercourse."  Seeking redress for what he alleges was an unfair and biased disciplinary process, Doe filed suit against Stonehill asserting, inter alia, breach of contract, sex discrimination in violation of Title IX, negligence, and defamation.  In a thoughtful decision, the district court concluded that Doe's allegations were insufficient to support any of his claims, and it dismissed his complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doe v. Stonehill Coll., Inc., No. 20-10468-LTS, 2021 WL 706228 (D. Mass. Feb. 23, 2021), at *1.  After review of the operative complaint and related materials, we reverse dismissal of the breach-of-contract claim but otherwise affirm the decision of the district court.

## I.

Because Doe appeals the dismissal of his complaint, "we rehearse the facts as they appear in the plaintiff['s] complaint[] (including documents incorporated by reference therein)." Hochendoner v. Genzyme Corp., 823 F.3d 724, 728 (1st Cir. 2016). Here, we consider Doe's complaint, Stonehill's sexual misconduct policy -- titled "S1.14 Opposition to Sexual and Gender-Based Misconduct and Interpersonal Violence" ("the policy" or "the

sexual misconduct policy"[1]) -- and documents produced as part of Stonehill's investigation into Doe's conduct.[2]

## A. The Relationship between John Doe and Jane Roe

Doe was admitted to Stonehill's class of 2021 in the spring of 2017. He subsequently joined a Facebook group for his class, where he met Jane Roe. They began to exchange messages through Snapchat, text, and Facebook. Once on campus, they continued to exchange messages and saw each other in person numerous times.

In October 2017, the pair's relationship "grew to include sexual intimacy." Compl. ¶ 35. The complaint describes three sexual encounters prior to the incident at the heart of this case. Each involved Doe "us[ing] his fingers to stimulate" Roe, with Roe "physically communicat[ing] her consent by removing her clothing, allowing him to fondle her and to rub her bare skin, and by making her vagina more accessible to him." Id. ¶ 38; see also id. ¶¶ 41, 44. In at least the first two encounters, Doe asked Roe "if she wanted him to proceed" after he had already been

---

[1] We refer to "the sexual misconduct policy" for simplicity, although the policy has broader coverage.

[2] The policy and the investigation documents were attached to Doe's amended complaint, Stonehill's motion to dismiss, or Doe's opposition, and they were considered by the district court with the parties' acquiescence. See Stonehill Coll., 2021 WL 706228, at *1 & n.2. Neither party challenges the authenticity of these documents or argues that their consideration at this stage is improper.

digitally stimulating her.  Id. ¶¶ 38, 41.  The first time, Roe responded that she did.  Roe subsequently asked Doe during that first encounter to stop "because she had once been sexually assaulted," and "Doe did stop as requested."  Id. ¶ 40. In the second encounter, when Doe asked for "permission to proceed," Roe responded with "the same physical cues as on the first incident and, when she wanted him to stop, she told him to stop, and he did."  Id. ¶ 41.  In the third encounter, Doe "[a]gain" initiated the sexual activity without first asking permission, "but [Roe] presented the same physical cues from prior interactions that she wanted him to proceed to digitally stimulate her." Id. ¶ 44.

**B.  The November 19th Incident**

In the early morning hours of November 19, 2017, Doe received a Snapchat message from Roe stating that she was scared to walk back to her room alone from another dormitory, New Hall. Doe offered to walk her back, and she accepted the offer.  Doe approached New Hall, but after receiving no response to a message asking Roe about her location, he started to walk to Roe's dormitory.  He soon received another message from Roe saying that she had been talking to an ex-boyfriend on the phone and that she had made it back to her dorm.  After Doe walked to Roe's room and knocked on her door, she opened the door and invited him in.

Roe lay down on her bed, and Doe joined her.  Roe then got up, removed her t-shirt to switch to a tank top and a fleece

pullover, and returned to lay next to Doe. Doe began rubbing Roe's back "and then moved his hand to her vagina and began to digitally stimulate her." Compl. ¶ 58. Roe began to make moaning noises and, when Doe stopped, "Roe rolled onto her back and made her vagina more accessible to him," which Doe believed was intended "to make it easier for him to continue stimulating her." Id. Doe asked Roe if she liked what he was doing, and she did not respond but "continued to make the moaning noises." Id. ¶ 59. Doe continued to touch Roe, but after a short time he asked if she wanted him to stop. Again, Roe did not respond. Instead, she rolled over so her back was to Doe and "began breathing heavily." Id. Doe asked if Roe was okay, and she responded "it's not you. It's ok." Id. ¶¶ 62, 263(I). Roe then rolled over toward Doe, and believing that she had gone to sleep, Doe left.

Later that morning, Doe received Snapchat messages from Roe stating "things like, 'what just happened?'[,] 'that wasn't consensual,' and[] 'that wasn't ok.'" Id. ¶ 65. Doe responded: "Please forgive me for being a drunken idiot. I'd never want to hurt you." In a second message, he wrote: "I'm so really sorry I know I fucked up, I totally misread the situation. What can I do to make it right?" Id. ¶ 70. Doe avers that neither message was true because he "had not been drinking on the evening of November 18-19[,] [h]e was entirely sober," and he "did not mistake the physical cues Jane Roe sent him." Id. ¶ 71. Rather, he claims

- 5 -

that he was puzzled and alarmed by her messages but accepted responsibility to make Roe "feel better about herself" because he knew that she "lacked self confidence and often felt vulnerable." Id. ¶¶ 66, 68, 72.

The next day, November 20, Roe filed a sexual misconduct complaint against Doe. Michael Labella, Director of Community Standards at Stonehill, sent Doe a letter that same day informing him that an incident report had been filed and that a no-contact order was in place between him and Roe.

## C. Roe's Complaint

On November 21, Roe met with Stonehill's Title IX Coordinator[3], Lily Krentzman, and provided a written statement.[4] In her statement, Roe described Doe as "a boy on the football team [with whom] I had previously made out sober twice in my room." Compl. ¶ 95. With respect to her interaction with Doe on November 19, she described the incident as follows. When Doe arrived at her room, "she told him that she was 'drunk' and 'tired' and did

---

[3] Title IX prohibits sex discrimination by educational institutions that receive federal financial assistance. See 20 U.S.C. § 1681(a). Such institutions are required to designate a "Title IX Coordinator" to "coordinate [their] efforts to comply with" the statute. 34 C.F.R. § 106.8(a).

[4] Roe's statement was quoted, apparently in full, in a memo to file prepared by Krentzman that was attached as an exhibit to the final report submitted by Stonehill's Title IX investigators. See infra. Krentzman reported that Roe had submitted her statement in writing because "[s]he was too nervous to speak."

not 'want to do anything.'" Id. ¶ 96(D). She then told him that she was going to bed, lay down, and closed her eyes. Doe tried to kiss her, and she stated, again, "stop, I'm drunk. I don't want to do anything with you." Id. ¶ 96(E)-(F). Doe started rubbing her back and her thigh and Roe started to fall asleep, but she described feeling "completely shocked, awake, startled, and[] taken aback," when Doe "moved his hand down [her] thigh quickly and brushed against [her] vagina." Id. ¶ 96(G)-(H). She pushed Doe away and said "I don't want to," but "then he started fingering [her]." Roe added that "she was 'too drunk to fight him off.'" Id. ¶ 96(I)-(J). Roe stated that she told Doe three or four more times to stop and that "I don't want this," but he continued. Id. ¶ 96(K). Eventually, Roe "jumped to some sort of last ditch effort to save myself [and] started crying [and] hyperventilating" until she pretended to fall asleep and Doe left. Id. ¶ 96(L).

The next day, November 22, Labella informed Doe by letter that Stonehill would be investigating the incident and that Roe alleged that Doe had violated a provision of the college's sexual misconduct policy by engaging in "nonconsensual sexual intercourse"[5] with her. The letter noted that two Title IX

---

[5] The policy defines nonconsensual sexual intercourse as "the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim." Under the policy, "[c]onsent" is defined in part to "mean[] informed, freely, and voluntarily given agreement, communicated by clearly

- 7 -

investigators, David Bamford and Shayla Jordan, would be conducting the investigation.

**D. Stonehill's Investigation**

Stonehill's sexual misconduct policy provides for an investigative model encompassing the following steps:

1. A report of sexual misconduct is referred to the college's Title IX investigators. The student accused of sexual misconduct must be notified of the report.

2. Both the complainant and respondent may submit "potential witness names and questions to be asked during the investigative process." The Title IX investigators have the discretion to assess the "appropriateness and relevance" of such submissions.

3. Both parties have the right to "be informed of all witnesses being interviewed."

4. After completing their investigation but before making their recommendation, the investigators "will offer to meet with [the parties] separately to discuss . . . the facts gleaned in the matter and to offer a final opportunity to the parties to ensure both have been afforded the opportunity to present all relevant witnesses and evidence before the finding is reached."

---

understandable words or actions, to participate in each form of sexual activity."

5. Both parties will "[b]e allowed to review and respond to pertinent evidence received" and "to review and respond to the investigative report before it is submitted to the Ass[ociate] Vice President for Student Affairs/Dean for Students ['AVPSA']."[6]

6. After "the facts that will be used to reach the outcome are shared with the parties," the investigators will submit a final report to the AVPSA. The final report "will contain factual findings and a recommendation of responsibility as to the original claim and/or any lesser offense."

7. In making their final recommendation to the AVPSA, the investigators apply a preponderance of the evidence standard and "must consider the totality of the evidence presented."

8. The AVPSA "will determine if the facts gleaned in the investigation . . . align with the findings offered by the [i]nvestigator[s] and will then issue a formal decision in the matter, including sanctions." The parties must be notified within five business days, in writing, of the AVPSA's decision.

---

[6] These two rights were added to Stonehill's policy in a revised version dated December 2017. The parties presume that the revised policy applies to Doe's case, and we therefore do likewise.

9.    Either party "may submit a request for an appeal" of the AVPSA's decision to the Vice President for Student Affairs.

On November 29, ten days after the incident, the Title IX investigators interviewed Roe for the first time. The investigators reported that, in the interview, Roe "stated that her written statement contained her account of the incident and that she preferred not to re-tell the details of the incident." However, according to the investigators' report, see infra, "[s]he did agree to answer questions about the statement and incident." In the interview, Roe reiterated the characterization of her relationship with Doe that was included in her written statement -- i.e., that they were "surface level friends" who had "made out" twice in her room -- and she again failed to report that the previous encounters involved consensual digital penetration of her vagina.[7]

Doe was interviewed on December 8 with his attorney present. He also provided a written statement to the investigators that described his interactions with Roe throughout the fall of 2017. Doe's complaint does not specify what the investigators told him about the content of their interview of Roe, but his

_____

[7] As described infra, Roe acknowledged in a later interview with the investigators that the "previous encounters in her room involved consensual sexual contact" that "includ[ed] digital penetration of her vagina."

description of what he told the investigators includes responses to details of Roe's account.[8] The investigators also informed Doe that Roe had provided a witness (Witness #2) who could confirm that Doe was in Roe's dorm room that night. Doe identified a witness (Witness #1) who could corroborate that he had not been drinking that night. Doe understood the investigators to say they were unlikely to interview either witness, although both were later interviewed.

On December 20, the investigators informed Doe that the "interview phase" of the investigation had concluded and asked to meet with him to review the case before they prepared their report. However, as described infra, when the investigators met with Roe on December 28 to review their findings, they evidently requestioned her based on the version of events obtained from Doe on December 8. It was apparently during this second interview that Roe first admitted that the "previous encounters in her room involved consensual sexual contact" that "includ[ed] digital penetration of her vagina." On January 12, 2018, the investigators reviewed their factual findings with Doe and his attorney over the

---

[8] For example, Doe alleges that he told the investigators that, "at no point did Jane Roe 'pull away, ask [John Doe] to stop,'" "'or protest in any manner.'" Compl. ¶ 263(F) (alteration in original). In his brief on appeal, Doe indicates that, before his interview, he received a copy of the memo drafted by Krentzman, Stonehill's Title IX Coordinator, which included Roe's written statement.

phone and said they would be preparing and forwarding a written report of the disputed and undisputed facts.  On January 23, the investigators sent Doe their written findings of fact and gave him seven days to submit a response.

The written findings document, which spanned five pages, contained background information on the investigation, several provisions from the sexual misconduct policy, and "Findings of Fact" consisting of summaries of witness interviews, including the interviews of Witness #1 and Witness #2.  The investigators stated that Roe had described the pair's relationship as "surface level friends" who "would say 'hello' if they saw each other on campus." In the passage recounting their past intimate activity, Roe was quoted as saying that "the two occasions when she 'made out' with [Doe] in her residence hall room were in late September or early October."  In the next sentence, however, the investigators stated that Roe had "clarified" that the previous encounters in her room "involved consensual sexual contact, including digital penetration of her vagina."  The written findings also reported Roe's contention that she was drunk on the night of November 18-19, "but 'not slipping over myself' drunk."  She had elaborated that, "on a scale of one to ten, with ten being very drunk[,] she was probably a six."

After reviewing this document, Doe and his attorney asked that the final report make explicit that Roe had admitted to

- 12 -

a previous, consensual sexual relationship with Doe only in a second interview. Jordan, one of the Title IX investigators, replied that they would include that information in their final report.

## E. Adjudication of the Final Report

On approximately February 7, the investigators submitted a final, two-part report to AVPSA Kevin S. Piskadlo. Part 1 of the report was the document previously shared with Doe and Roe. Part 2 of the report -- which the parties had not reviewed -- presented a list of disputed and undisputed facts, a section labeled "Credibility Assessment," and a section labeled "Investigative Findings."[9] The findings section consisted of a single sentence: "The [i]nvestigators determined that based on a preponderance of the evidence it is more likely than not that [Doe] violated Policy S1.14, specifically, non-consensual digital penetration of the vagina."

Part 1 of the final report did not include the revision Doe had requested concerning Roe's evolving description of their prior relationship. Instead, the investigators simply reported in

---

[9] Stonehill's policy does not explicitly provide for the creation of a bifurcated report, but the investigators may have prepared and distributed Part 1 to comply with the requirement in the policy that they share "the facts gleaned in the matter" with the parties before making a final recommendation. Doe did not receive Part 2 until he was given a copy of the final report after he was told the outcome of the investigation on February 12. See infra.

Part 2 that the nature of their relationship "was clarified by [Roe] in the review of facts."[10]

Part 2 also included other information that was not in Part 1. It added to Roe's description of her level of intoxication. The investigators stated that, "[d]uring the course of the investigation [Roe] indicated that she believed that she was intoxicated to the point of incapacitation and was, therefore, unable to consent to sexual activity." Part 2 also highlighted an exchange between Roe and Witness #2 shortly after Doe's visit to Roe's room in which Roe allegedly repeated the comment, conveyed to Doe in a Snapchat message, that her interaction with Doe "wasn't ok." The investigators observed that "[t]he comment made by [Roe] to her hall mate soon after the incident supports her statements and belief that the sexual contact was unwanted." This exchange did not appear in the summary of Witness #2's interview in Part 1 of the report, and thus was not disclosed to Doe when the investigators reviewed Part 1 of the report with him.

Several days after the investigators submitted their report, Doe met with Piskadlo, who informed him that he had been found in violation of Stonehill's prohibition on "nonconsensual sexual intercourse." Piskadlo also gave Doe a letter stating that

_____

[10] Stonehill notes in its brief that "Roe was interviewed twice, on November 29 and December 28," and it is therefore undisputed that the latter meeting was at least partially a second interview and not merely a review of previously obtained facts.

Piskadlo had reviewed the investigators' final report and he was dismissing Doe from Stonehill.[11] Doe alleges that Piskadlo told him that expulsion was the only permissible sanction for such a violation.[12]

Doe appealed Piskadlo's decision to Pauline Dobrowski, Stonehill's Vice President for Student Affairs, submitting a detailed, thirty-seven-page memorandum that primarily alleged procedural problems with Stonehill's investigation into Roe's complaint. Dobrowski denied Doe's appeal, stating in a letter that, after reviewing Doe's materials and the investigative report, she had "determined that the [i]nvestigators' process was compliant with our policy and that there was no new information presented that would have impacted the outcome."[13]

---

[11] The contents of Piskadlo's letter are described infra.

[12] Stonehill's sexual misconduct policy does not specify what sanctions will apply to any given situation but does say that sanctions "includ[e] dismissal from the College."

[13] The new information that Doe offered in his appeal consisted of Facebook Messenger messages that he had exchanged with Roe during the summer and fall of 2017 that he said he had recently been able to recover. See Compl. ¶ 424. Doe asserted that those messages support his explanation for the Snapchat messages he sent to Roe on the morning of November 19. Specifically, he argued that they

> show that [Roe] shared her fears and apprehensions with him and that he was invariably supportive. They show that he always encouraged her, spoke highly of her, and, at one point when she appeared to be in crisis, provided her with [a] "helpline" where she could get assistance.

## F. Procedural History

Doe filed this action against Stonehill in March 2020. In his lengthy amended complaint, which spans 569 paragraphs and more than 120 pages, Doe alleges breach of contract, sex discrimination in violation of Title IX, unjust enrichment, promissory estoppel, negligence, defamation, fraud, negligent infliction of emotional distress, breach of the covenant of good faith and fair dealing, and breach of the common law duty of fairness. Doe sought a declaratory judgment stating that, inter alia, Stonehill's investigation violated various rights, the finding of responsibility against him was illegal, and Stonehill's policies violate Title IX; a permanent injunction compelling Stonehill to vacate its findings and remove all negative references from Doe's record; and attorney's fees.

At the heart of Doe's complaint, as described in more detail below, are allegations of multiple procedural errors in the investigation that Doe claims denied him the fair and thorough process promised by Stonehill's sexual misconduct policy. He asserts that those errors affected the misconduct inquiry and

---

These communications show that he . . . viewed her as vulnerable and fragile. With these impressions clearly documented in their Facebook communications, these messages are consistent with John Doe's willingness on the morning of November 19 to take responsibility via Snap[c]hat for a wrong he never committed.

resulted in his unjustified expulsion from Stonehill.  He further claims that the flaws in the proceedings resulted from sex bias on the part of Stonehill's investigators and administrators.  See, e.g., Compl. ¶ 488 ("The proceeding by which he was found to be responsible for the alleged sexual misconduct was flawed and fundamentally biased and unfair."); id. ¶ 490 ("The particular circumstances suggest that gender was a motivating factor behind the erroneous finding.").

Stonehill moved to dismiss the complaint for failure to state a claim.  After a hearing, the district court concluded that Doe failed to plausibly state a claim for relief under any of the causes of action asserted in his complaint and granted Stonehill's motion as to all counts.  Stonehill Coll., 2021 WL 706228, at *1. Doe timely appealed.

## II.

We review de novo the district court's dismissal of a complaint for failure to state a claim.  Saccoccia v. United States, 955 F.3d 171, 174 (1st Cir. 2020).  In doing so, we "assum[e] that all pleaded facts and reasonable inferences drawn from them are true."  Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 16 (1st Cir. 2020).  To survive a motion to dismiss, a plaintiff must allege facts sufficient to state a plausible claim for relief.  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).  In this context, plausible "means

- 17 -

something more than merely possible, and gauging a pleaded situation's plausibility is a 'context specific' job that compels us 'to draw on' our 'judicial experience and common sense.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

We consider each of Doe's asserted causes of action that he raises on appeal.[14]

## A. Breach of Contract

As we have previously explained, "[a] student's relationship to his university is based in contract." Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007). Stonehill does not dispute that its sexual misconduct policy establishes a contractual relationship between the college and Doe. Doe's claim that Stonehill breached the terms of this policy -- and thus his contract with the college -- is governed by Massachusetts law. Cloud v. Trs. of Bos. Univ., 720 F.2d 721, 724 (1st Cir. 1983).

Massachusetts recognizes two distinct theories of breach of contract between a student and an educational institution. Under the "reasonable expectations" theory, a court must consider "the standard of 'reasonable expectation -- what meaning the party making the manifestation, the university, should reasonably expect

---

[14] The district court concluded that Doe waived his unjust enrichment, promissory estoppel, and fraud claims. Stonehill Coll., 2021 WL 706228, at *17. Doe does not challenge that determination on appeal, so we likewise treat those claims as waived.

- 18 -

the other party to give it.'" Schaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000) (quoting Cloud, 720 F.2d at 724). We are mindful that "a student's expectation can be reasonable even if the precise expectation is not stated explicitly in the contract's language." Sonoiki v. Harvard Univ., 37 F.4th 691, 709 (1st Cir. 2022). Instead, the appropriate inquiry is whether "the student's expectation, viewed objectively alongside the express terms of the contract, is based on the student's fair interpretation of the contract's provisions." Id. Thus, we review "whether [Doe] has asserted facts which established that [Stonehill] failed to meet his reasonable expectations, thereby violating its contract with [him]." Schaer, 735 N.E.2d at 378. Of course, as with any breach-of-contract claim in Massachusetts, Doe also must show that he suffered harm from the contractual breaches he alleges. See, e.g., Squeri v. Mount Ida Coll., 954 F.3d 56, 71 (1st Cir. 2020) (citing Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016)).

The second theory of contractual breach focuses on whether the student was treated with "basic fairness." Schaer, 735 N.E.2d at 380. Broadly, the basic fairness framework ensures that "[a] private school may not arbitrarily or capriciously dismiss a student or do so in bad faith." Driscoll v. Bd. of Trs. of Milton Acad., 873 N.E.2d 1177, 1187 (Mass. App. Ct. 2007). Stonehill's obligation to act with basic fairness flows from the sexual misconduct policy's explicit commitment to provide a "fair"

- 19 -

investigative process and the college's "independent duty to conduct disciplinary procedures with basic fairness imposed by Massachusetts law." Doe v. Trs. of Bos. Coll. ("Bos. Coll. I"), 892 F.3d 67, 87 (1st Cir. 2018).

Doe's sprawling complaint alleges numerous ways in which the Title IX investigators and the college's administrators failed to conduct his disciplinary proceedings consistently with Stonehill's sexual misconduct policy and thus breached his contract with the college. Although Doe faults the district court for not addressing many "discrete instances of Stonehill's contract breaches," Appellant's Br. at 30, we are satisfied that the court considered the procedural deficiencies that warranted its attention, albeit sometimes in its analysis of Doe's Title IX claim. See, e.g., Stonehill Coll., 2021 WL 706228, at *12 (noting that Doe "restates many of the same issues [in his contract allegations] that he alleged as Title IX violations"). We likewise focus on the alleged breaches that, in our view, warrant our attention, taking each contract theory in turn.[15]

---

[15] We recognize that Doe highlights some of these alleged breaches only in the Title IX portion of his brief. Nonetheless, his Title IX claim is premised in substantial part on procedural irregularities that he alleges were breaches of Stonehill's obligations under its sexual misconduct policy, including "the [p]olicy's 'thoroughness' requirement." Appellant's Br. at 46. We thus view such alleged deficiencies as appropriately addressed in our breach-of-contract assessment.

### 1. Reasonable Expectations

Doe's complaint broadly alleges that his expectations were not met because the investigation failed "to follow the procedures set forth in the S1.14 Policy." Compl. ¶ 501. Specifically, he claims that the policy gave rise to his reasonable expectations that (1) he would be given the opportunity to review all relevant facts gleaned in the investigation before the final report was sent to the AVPSA, see id. ¶¶ 106(F), 194; (2) he would receive notice of all witness interviews, see id. ¶¶ 191, 249; (3) Stonehill would "conduct a complete investigation," id. ¶ 501, that was "thorough[] and dedicated to impartial fact-finding," id. ¶ 106(E); and (4) the AVPSA, Piskadlo, would "review[] and ma[ke] independent determinations as to whether the facts gleaned in the investigation aligned with the findings of the [i]nvestigators," id. ¶ 414(a). Doe alleges that the investigative process in his case did not fulfill these expectations and therefore lacked "fundamental fairness." Id. ¶ 501; see also id. ¶¶ 234, 276, 326, 347, 352-53, 362, 385, 414(a).

Drawing all reasonable inferences in Doe's favor, as we must, we cannot say that the four deficiencies alleged above, and described in more detail below, are inadequate on their face to state a plausible breach-of-contract claim under the reasonable expectations framework.

**(a) Opportunity to Review Facts**

Stonehill's policy states that "the [i]nvestigator will offer to meet with the complainant and respondent separately to discuss (post-fact finding but before a recommendation has been made with regard to responsibility) the facts gleaned in the matter," thereby giving the parties "a final opportunity . . . to present all relevant witnesses and evidence before the finding is reached." The policy further states that the parties will "[b]e allowed to review and respond to pertinent evidence received." This language clearly indicates that Doe would have the right to review any relevant facts the investigators intended to submit to the AVPSA. In addition, he could reasonably expect that he would have the opportunity to explain or refute assertions by other interviewees that contradicted his account of what occurred and to correct any errors in the investigators' description of his own interview.

Doe claims that, contrary to these expectations, the Title IX investigators included two significant statements in Part 2 of the final report to AVPSA Piskadlo that did not appear in Part 1 of the report -- the section he was given for his review and response. Doe cites the following statements from Part 2 as inappropriately omitted from Part 1:

● "When Witness #2 made a comment about seeing [Doe] at [Roe's] door earlier in the day, [Roe] responded by [saying] something to the effect of 'it wasn't ok.'"[16]

● Roe's statement, as described by the investigators, "that she believed that she was intoxicated to the point of incapacitation." See, e.g., Compl. ¶ 385 (alleging that Doe first learned of this statement from AVPSA Piskadlo). The district court discounted the import of these omitted statements, largely because it viewed them as cumulative of statements that did appear in Part 1. See Stonehill Coll., 2021 WL 706228, at *8-9, 13.[17]

Like the district court, we are unpersuaded that the inclusion only in Part 2 of Roe's description of herself as incapacitated plausibly impacted Doe's defense. In Part 1 of the report, Roe is quoted as saying that her level of intoxication was "'not slipping over myself' drunk." The pertinent statement in

---

[16] Witness #2 reported seeing Doe at Roe's door "late at night" -- i.e., in the early hours of November 19 -- and the comment quoted above reportedly was made "later in the morning of the incident."

[17] We decline to consider two other facts discussed by the district court that Doe argues were improperly omitted from Part 1 and included in Part 2. See Stonehill Coll., 2021 WL 706228, at *8-9. One such omission was not clearly referenced in Doe's complaint -- specifically, the fact that Doe, and not just Roe, had reported that Roe "eventually cried" during the November 19th encounter. The other supposed omission appears to be based on Doe's misreading of the report to attribute to Roe a statement "that prior instances of sexual intimacy had involved verbal consent." Id. at *8. In fact, the report attributes that statement to Doe.

Part 2 -- that "she believed that she was intoxicated to the point of incapacitation and . . . therefore[] unable to consent to sexual activity" -- unquestionably differs in degree from her original report and goes to the heart of Doe's defense that the encounter was consensual, as well as to Roe's credibility. Indeed, Doe alleges that "[h]e did not detect any alcohol on [Roe's] breath nor did she show any signs of having consumed any alcohol" on the evening in question. Compl. ¶ 56. Yet, we fail to see how Doe would have responded differently if Part 1 had reported that Roe claimed she was incapacitated rather than, as she put it, "a six out of ten, with ten being the most drunk." It already was clear that Doe was challenging her claim of intoxication -- the report noted that Doe "said that he did not think she had been drinking at all." Moreover, the investigators concluded in Part 2 of the report that Roe "was not incapacitated due to alcohol consumption."[18] Hence, we fail to see how Doe's ability to respond

_____

[18] In reaching that conclusion, the investigators relied on the sexual misconduct policy's description of an incapacitated person as someone who "lacks the capacity to understand the 'who, what, when, where, why, or how' of the sexual interaction." The investigators noted that Roe's "detailed description of the incident, and the many facts corroborated by [Doe], indicated an understanding of the situation."

to Roe's account was affected by this omission, given that he was aware that she was claiming to be heavily intoxicated.[19]

The investigators' treatment of the exchange between Roe and Witness #2, however, is more problematic. The fact that Roe may have communicated to a third party the same sentiment about the encounter that she expressed in a message to Doe -- "it wasn't ok" -- inescapably lends credibility to Roe's depiction of the incident.[20] Indeed, Part 2 of the report invokes Roe's supposed comment to Witness #2 as "support[] [for] her statements and belief that the sexual contact was unwanted." By contrast, the summary of Witness #2's interview that appeared in Part 1 of the report contained no reference to this statement that was so important to

---

[19] However, as we explain below, the investigators' handling of Roe's claim of intoxication is relevant for a different reason. See infra.

[20] Although the district court correctly observed that Doe did not allege in his complaint how the omission of Witness #2's statement from Part 1 was prejudicial, see Stonehill Coll., 2021 WL 706228, at *13, it is a fair inference from Doe's allegations that -- as he argued in his Stonehill appeal -- he was unfairly blindsided by the statement's inclusion in Part 2. Doe's complaint alleges that he was told by the investigators that Witness #2's knowledge was relevant only to circumstances "prior to the incident," Compl. ¶ 336 -- specifically, to confirm Doe's presence in Roe's dorm "on the night in question," id.; see also id. ¶ 281. However, as he further alleges, the statement at issue referred to the incident itself. See id. ¶ 368(C). Notably, the district court did find that the failure to disclose Witness #2's statement in Part 1 violated Stonehill's policy. See Stonehill Coll., 2021 WL 706228, at *8.

- 25 -

the investigators in finding Roe's account of the November 19th incident more credible than Doe's.

The summary of Witness #2's interview in Part 1 does include the fact that she and Roe had a conversation shortly after the incident, but its content is described only as follows: "She [Witness #2] stated that she also remembers seeing [Roe] later the same morning and making a comment to her about [Doe] being at her door."[21] When reporting the "it wasn't ok" exchange between Roe and Witness #2, the investigators do not specify whether

_____

[21] Witness #2's interview was summarized in Part 1 as follows:

> Witness #2 stated that she remembers seeing [Doe] at [Roe]'s residence hall door, but does not recall the exact day or time. She stated that she also remembers seeing [Roe] later the same morning and making a comment to her about [Doe] being at her door.

> Witness #2 said that it was "late at night" when she was walking from her room . . . across the hallway [to the room of other friends]. [Roe]'s room is next to her friends' room. Witness #2 said that she saw [Doe] knocking at [Roe]'s door. She said his back was to her, but she still recognized him. She said that they did not interact and she was not in a position to notice if he appeared intoxicated. She said that he "was standing up fine." She said that a few minutes later she left her friends' room and he was no longer in the hallway. She does not know where he went . . ..

> Witness #2 said that "about a week before" this incident she had spoken with [Roe] about her and [Doe], but had no further information.

Witness #2 reported that comment to them or whether Roe herself told the investigators that she had made the comment to Witness #2.[22]    Regardless, we agree with Doe that the investigators' emphasis on the comment as corroboration of Roe's account means that its omission from Part 1 -- denying Doe the opportunity to investigate and possibly challenge its accuracy -- cannot be dismissed as inconsequential on the ground that the statement was merely cumulative of Roe's text message.

Hence, we conclude that Doe has stated a plausible breach-of-contract claim based on the omission of the "it wasn't ok" exchange from Part 1 of the report.

---

[22] In his Stonehill appeal, Doe highlighted the ambiguity as follows:

> From the summary [in Part 2], it is impossible to say whether Witness #2 or Jane Doe was the source of [the] assertion that Jane Doe made this comment to Witness #2. . . .
>     If the comment came from Jane [R]oe, [John Doe] would not have been able to question her about it.  But, he [or his attorney] could have asked Witness #2.  If she confirmed that Jane Doe had said that, it would have had some limited probative value. If Witness #2 denied it, it would have created yet another instance in which Jane Doe had made a representation that had proved false. Whoever was the source of this information, John Doe was entitled to know it before the Interim Report became the Final Report. (This is particularly so because it appears that the [i]nvestigators placed unusual weight on it. . . .).

**(b)  Notice of Witness Interviews**

Doe's allegation that he reasonably expected that he would be notified of witness interviews is based on the language in Stonehill's policy stating that all parties are "allowed to submit potential witness names for consideration" and will "be informed of all witnesses being interviewed."  The policy also entitles parties "to submit questions for the [i]nvestigator to ask during the investigation."

In rejecting Doe's lack-of-notice claim, the district court noted that "he point[ed] to no provision of the [p]olicy requiring investigators to inform a party prior to conducting an interview," Stonehill Coll., 2021 WL 706228, at *9, and it endorsed Stonehill's argument that "a requirement of advance notice would hinder the school's ability to conduct a fair and impartial proceeding because it could allow witnesses to be pressured or le[]d," id. at *9 n.7.  However, given the requirement that parties must be informed of all witnesses being interviewed, we agree with Doe that the policy language reasonably may be read to promise advance notice of those interviews.  Otherwise, the meaningfulness of the opportunity to propose questions for the witnesses would be greatly diminished.  See Sonoiki, 37 F.4th at 709 (explaining that we will find "a plausible claim" where "the reasonable expectation

- 28 -

is based on the student's feasible interpretation of the contract language").[23]

We thus consider whether the asserted lack of notice for the two interviews cited by Doe -- Witness #1's and Roe's -- plausibly supports a breach-of-contract claim.

### i. The Interview of Witness #1

Doe alleges that the investigators indicated that they were unlikely to question either party's proffered witness (i.e., Witness #1 for Doe and Witness #2 for Roe) and then failed to give him notice when they decided to interview Witness #1.[24]  We think it simply implausible that, viewed in context, that failure harmed Doe's defense.  A summary of Witness #1's interview was included in Part 1 of the investigators' report, and Doe therefore had an opportunity to correct any misinformation in it.  Moreover, that summary consisted entirely of Witness #1's account of the time he spent with Doe on the night of November 18-19, all of which

---

[23] Although we conclude that Stonehill's policy reasonably may be read to promise advance notice of interviews, we reject Doe's contention that the same language promised "notice of the topics to be covered" in those interviews.  The right to suggest questions does not carry with it access to the investigators' decisions on what to ask.  "[V]iewed objectively alongside the express terms of the contract," Doe's expectation on this point was unreasonable. See Sonoiki, 37 F.4th at 709.

[24] Doe's complaint states that he did later receive notice of the investigators' intent to interview Witness #2, albeit on the same day they conducted the interview.

validated Doe's description of events before he headed to Roe's dormitory.[25]

### ii. The Second Interview of Roe

Doe's lack-of-notice allegation as to Roe focuses on the investigators' meeting with her to review the facts they developed during their investigation -- a session that Stonehill acknowledges became a second interview. To provide context for our discussion of this lack-of-notice claim, we briefly recap the timing of the investigators' interactions with Roe and Doe:

> **November 29:** The investigators meet with Roe.
> **December 8:** The investigators meet with Doe.
> **December 20:** The investigators tell Doe in an email that the interview phase of the investigation was complete and the next step would be "to meet and review the case before we create our investigative report." Compl. ¶ 285.
> **December 28:** Despite telling Doe that the interviewing had been completed, the investigators conduct a second interview with Roe -- along with reviewing the facts with her.
> **January 12:** The investigators review the facts with Doe by phone.[26]

---

[25] Specifically, according to the investigators' summary, Witness #1 stated that (1) he was with Doe between 9 PM and approximately midnight on November 18; (2) Doe received a text message toward the end of that timeframe, and then said he needed to meet a friend; and (3) Doe had nothing to drink while they were together.

[26] Doe contends that the investigators failed to notify him before either of their meetings with Roe, but he emphasizes the lack of notice for the questioning of Roe that took place on December 28 -- after his own interview.

The investigators' report indicates that it was during their second meeting with Roe that she "clarified" that she and Doe had previously engaged in consensual sexual activity. Having by then heard Doe's conflicting account of the parties' prior relationship and the alleged nonconsensual encounter, it is a fair inference that the investigators had planned to requestion Roe and ask about Doe's version of events, which they did. Hence, the investigators' alleged failure to provide Doe with advance notice of their renewed questioning of Roe is plainly a contractual breach.

We also think it plausible that the lack of notice harmed Doe's defense. Although he certainly knew that Roe, as the complainant, would be interviewed, he was told on December 20 -- before her requestioning -- that the interview phase of the investigation had been completed. Doe thus alleges that, before Roe's second interview, he was denied "the opportunity to submit potentially detailed questions to the Title IX [i]nvestigators to pose to Jane Roe." Compl. ¶ 296; see also id. ¶ 326.

Arguably, Doe had ample opportunity earlier in the process to offer such detailed questions to be asked of Roe. As noted above, Doe indicates in his brief that he had obtained the memo prepared by Title IX coordinator Krentzman -- containing Roe's description of the sexual encounter -- before his own interview with the investigators on December 8. At that time, Doe had no

- 31 -

reason to think the interview process had ended, and he thus could have offered questions to challenge Roe's account when he first met with the investigators. Regardless of whether he took that opportunity, however, he was entitled to notice that Doe would be questioned again. That notice would have served as an implicit invitation to submit follow-up questions and given him the motivation to do so. Instead, again, Doe was told on December 20 -- eight days before Roe's second meeting with the investigators -- that the interviewing was done. With notice that the investigators would be requestioning Roe, Doe could have offered either pointed questions about the November 19th incident itself or additional background about the pair's prior relationship for the investigators' use in formulating their own questions.[27] Such questions may have elicited responses from Roe that would have been helpful to Doe. Hence, at this juncture, we think it plausible that the alleged failure to provide Doe with notice of Roe's second interview compromised Doe's ability to defend himself.

---

[27] Doe alleges that the investigators did not want him to pose questions to Roe "about their sexual interaction on the night in question" and that the investigators "knew that John Doe was likely to submit questions about the nature, extent, and timing of the sexual interaction between Jane Roe and John Doe as well as how and when Jane Roe consented to his sexual stimulation of her." Compl. ¶¶ 254, 253.

**(c) Fair and Thorough Investigation**

Stonehill's policy states that "[t]he College will take appropriate actions to ensure that investigations of sexual/gender-based misconduct . . . are completed in a prompt and equitable manner, with a dedication to impartial fact finding," and it also states that "the fairness and thoroughness of the process are paramount."  Doe alleges that the investigators failed to meet their obligation to perform a fair and "complete investigation" in various ways.[28]  Compl. ¶ 501.  We focus on four alleged deficiencies -- three addressing the investigators' handling of Roe's account of what happened and one involving the investigators' treatment of Doe's account -- that touch on Doe's and Roe's credibility and thus appear significant in evaluating their conflicting versions of the November 19th incident.

**i. Investigators' questioning of Roe**

Doe claims that the investigators accepted Roe's written summary, which she had given to Title IX Coordinator Krentzman, without pressing her on important details of her account.  See Compl. ¶¶ 243-44.  In rejecting this contention, the district court cited the portions of Part 1 of the investigators' report stating that Roe "did agree to answer questions about the statement and

_____

[28] Doe uses the word "complete" in his complaint as a synonym for "thorough."  We see no significance in any distinction between the terms.

- 33 -

incident" and that "[t]he investigators asked questions to clarify or expand on the details of [her written] statement." Stonehill Coll., 2021 WL 706228, at *10 (last alteration in original) (emphasis omitted).

However, Part 1's summary of the interview of Roe has an important gap. It indicates that the investigators discussed Doe's identity, Roe's previous relationship with him, the timing of the incident, Roe's level of intoxication, her perception of how much Doe had been drinking, when Doe left her room, and her communication with Doe after the incident. But it does not refer to Roe's description of how the sexual activity began or how she responded to Doe's actions during the incident. See Compl. ¶¶ 345-46 (stating that Part 1 "omitted any description of the initiation of their sexual interaction, the progress of their sexual interaction, [and] the verbal and physical indications she gave to John Doe to either not commence or to cease sexual interaction"). Rather, Part 1 of the report skips from Roe's statement that "she did not observe behavior in [Doe] to indicate that he had been drinking" to her statement that "after she began to cry, hyperventilate, and pretend to 'fall asleep' [Doe] left 'relatively quickly.'"

Part 2 of the report adds some detail. It lists as an undisputed fact that Doe "fingered" Roe while they were lying on her bed, and the list of disputed facts includes Roe's assertion

- 34 -

that "she explicitly told [Doe] to stop and pushed him away from her." Part 2 also reports Roe's statement that she repeatedly and explicitly said "that she did not want to engage in sexual activity."

The omission from Part 1 of the alleged misconduct itself from the description of Roe's interview supports Doe's allegation that the investigators at least initially "complied with Jane Roe's desire not to inquire into any of the details of her sexual encounter with" him -- and thereby failed to adequately probe the veracity of the most important part of her account. Compl. ¶¶ 243, 345. Whether that failure was rectified, at least in part, during Roe's second interview is unclear. The additional detail in Part 2 of the report simply mirrors the content of Roe's written statement to Krentzman[29] and, hence, does not show that the investigators ever asked Roe questions about the sexual activity itself.

### ii. Investigators' treatment of Roe's claim of intoxication

Doe alleges that the investigators failed to verify Roe's intoxication level even though her alcohol consumption factored heavily into her account of the incident. He further

---

[29] For example, in her written statement, Roe described telling Doe multiple times that she did not "want to do anything" with him and that, at one point while they were lying together on her bed, she "pushed him away."

alleges on information and belief that the "[i]nvestigators knew that they could determine whether Jane Roe had been consuming alcohol on the evening of November 18-19, 2017 and, if so, whether she was 'drunk' . . . by asking [her] to identify witnesses who would confirm that she was at New Hall on the evening of November 18-19, 2017; that she had consumed alcohol at New Hall; that she had become intoxicated, and that her state of intoxication was evident." Compl. ¶ 307.

We agree with Doe that a determination by the investigators that Roe had not -- or had -- been drinking would have been significant in assessing the parties' accounts of what occurred. As recounted above, Roe described her condition as significantly impaired, claiming that she was six out of ten on a ten-point scale of drunkenness and "believed that she was intoxicated to the point of incapacitation." Roe's credibility may have been seriously damaged if the investigators determined that she had not been drinking that night.[30] Indeed, Roe herself

_____

[30] Doe's complaint asserts, on information and belief, that

> the Title IX [i]nvestigators knew that investigating Jane Roe's assertions as to her pre-incident alcohol consumption and state of intoxication would not be difficult and was extremely important to properly assess her credibility, as well as the credibility of John Doe's assertion that she did not appear to have been drinking alcoholic beverages on the night of the incident.

seemed to attach great significance to her impaired condition, suggesting that her drunkenness made her more vulnerable to Doe's actions and thus supported her account of what happened.

### iii. Investigators' treatment of Doe and Roe's mutual sexual history

As described above, after originally stating that she and Doe were friends who had twice "made out sober," Roe acknowledged, apparently in her second interview, that they had previously engaged in consensual sexual activity. Part 1 of the report describes Roe's acknowledgment as follows: "She clarified that previous encounters in her room involved consensual sexual contact, including digital penetration of her vagina." In Part 2, the investigators restated Roe's admission -- i.e., that "at least" twice previously in her dorm room "they engaged in consensual sexual activity, including 'fingering'" -- and then specified the timing of her admission by saying that "[t]his point was clarified by [Roe] in the review of facts." (Emphasis added.)

Doe argues that, given Roe's admission of prior sexual activity similar to with Doe's description of the November 19th incident, Roe's original statement should have been more accurately characterized as a lie. Doe's complaint states that, upon reviewing Part 1 of the report, he and his attorney had noted that the investigators' depiction of Roe's "recantation" "both

Compl. ¶ 310.

- 37 -

obscure[d] it and tacitly justif[ied] it as a 'clarification'" --
which "could mislead the decision[]maker, the AVPSA/Dean of
Students, in weighing John Doe and Jane Roe's credibility." Compl.
¶ 352. Accordingly, Doe's attorney sent an email asking for a
revision: "We would like it noted that [Roe]'s clarification of
consensual sexual contact occurred only after she was interviewed
a second time. And it substantiates my client's statement
regarding prior sexual contact." Id. ¶ 353.[31]

As noted above, one of the investigators, Shayla Jordan,
responded to Doe's attorney, also by email, stating that she and
her colleague, David Bamford, had reviewed the request and "decided
to include this information in our final report that we share with
the Dean of Students." Id. ¶ 354. The final report nonetheless
left intact the Part 1 description of Roe's revised account and
Part 2 added without comment the information that Roe's
"clarification" was provided "in the review of facts" -- i.e., in
her second interview. The investigators provided no description
of how they elicited the "clarification" or how Roe explained her
earlier failure to disclose what would seem to be highly relevant
information about her relationship with Doe before the November

---

[31] We do not view the attorney's reiteration of the term
"clarification" as an endorsement of that terminology. Rather,
construing the complaint favorably to Doe, the attorney sought an
express acknowledgment that Roe had belatedly admitted that Doe,
not she, had accurately described their prior sexual activity.

19th incident.  Doe alleges that proper attention to Roe's changing account -- and the validation of his depiction of their relationship -- would have bolstered his credibility while diminishing hers.  See, e.g., id. ¶ 292 (asserting, "[o]n information and belief, the Title IX investigators . . . understood that, if John Doe was right about their pre-incident degree of intimacy, it would have also raised broader and serious questions about the reliability of Jane Roe's accusation").  That assertion easily passes the plausibility threshold.  Stonehill's decisionmakers -- Piskadlo and Dobrowski -- would not be meeting directly with Doe and Roe, and the investigators' depiction of the parties' credibility was thus an important aspect of the misconduct inquiry.  It is certainly plausible that the bland, unelaborated statement about Roe's "clarification" affected the administrators' credibility assessment.[32]

---

[32] In his complaint, Doe also points to the investigators' failure to include his account of Roe's response when he asked if she was okay after she became quiet during their November 19th encounter.  According to Doe, Roe responded: "[I]t's not you. It's ok."  See Compl. ¶¶ 62, 263(I), 315-319.  However, Doe neither objected to this omission from the summary of his interview when he reviewed Part 1 of the investigators' report nor raised the omission in his Stonehill appeal.  In his brief to us, he cites the paragraphs of his complaint that refer to Roe's response only in support of a general statement that the investigators failed to question Roe "about the incident and . . . their pre-incident intimate interactions."  Appellant's Br. at 25.  Because Doe has consistently chosen not to rely on Roe's "it's not you" response, we do not consider it.

**iv.  Investigators' treatment of Doe's Snapchat messages**

With respect to the investigators' treatment of his own account, Doe argues that they unfairly relied on his post-incident Snapchat messages "as a substitute for the searching analysis of 'consent' that was required of them."  Appellant's Br. at 49. Doe's Snapchat messages plainly were central to the investigation and -- as Doe emphasizes -- the investigators "relied heavily" on them in finding that he had engaged in nonconsensual intercourse with Roe.  Id. at 47.  Indeed, as the district court observed, this case is atypical because Doe's apologetic messages -- "Please forgive me for being a drunken idiot," "I'm so really sorry I know I fucked up," and "I totally misread the situation" -- may be read as "contemporaneous objective written evidence of non-consent." Stonehill Coll., 2021 WL 706228, at *12.

Doe, however, told the investigators that the messages were untrue and that he sent them to "make [Roe] feel better."[33]

---

[33] Doe's complaint states that he gave the investigators the following description of his communications with Roe:

> A.  [L]ater that morning, Jane Roe sent John Doe a message in which she "seemed to be upset" and John Doe responded by saying "whatever I thought would make her feel better" which included John Doe saying "I'm sorry;"
> B.  [W]hen he told Jane Roe he was "sorry", John Doe meant that he was "empathetic towards her and sorry that [Jane Roe] felt that way;"
> . . . .

In his complaint, Doe describes past communications with Roe that prompted his concern for her emotional stability, see Compl. ¶¶ 29-30, and he states that, after receiving her "that wasn't ok" message, he was concerned that her "unwarranted accusation might indicate that she was emotionally and mentally fragile" and that she "might have an emotional crisis" if he denied responsibility, id. ¶ 69. Although it is unclear how much detail Doe gave the investigators about his concern for Roe's emotional state, the summary of Doe's interview in Part 1 of the report does note that Roe "would often talk to [Doe] about 'being scared' or 'overwhelmed.'"[34]

The investigators did not entirely ignore Doe's explanation for his "mea culpa" Snapchat messages. Both parts of the report note that Doe stated repeatedly that "he sent the messages to make [Roe] feel better." Nor were the investigators obligated to accept Doe's explanation. However, when summarizing the evidence in Part 2 of their report, the investigators did not

_____

Compl. ¶ 264(A), (B). In their report, the investigators noted that Doe "stated that he was not drunk and denied that he did anything wrong."

[34] As described above, Doe submitted Facebook Messenger messages in his Stonehill appeal to reinforce his explanation for his November 19th Snapchat messages. See supra note 13. In that appeal, he argued that "[t]hese communications show that he . . . viewed her as vulnerable and fragile," and he asserted that the "messages are consistent with John Doe's willingness on the morning of November 19 to take responsibility via Snap[c]hat for a wrong he never committed."

link Roe's frequent communications about being scared or overwhelmed with Doe's explanation. To the contrary, the investigators' summary cites Doe's messages immediately after noting that Roe's comment to Witness #2 ("it wasn't ok") "supports [Roe's] statements and belief that the sexual contact was unwanted." The investigators go on to observe that "[t]he messages sent by [Doe] to [Roe] after the incident lead the investigators to conclude that [Doe] understood that the sexual interaction with [Roe] was unwanted as well."

In setting forth that conclusion, the investigators offered no rationale for rejecting Doe's characterization of his messages, an omission that is notable because other significant information that he had provided -- including the nature of his prior relationship with Roe and his lack of intoxication -- was corroborated. Meanwhile, as we have described, the investigators' report revealed an important omission in Roe's original description of her prior sexual history with Doe and her credibility as to her claimed intoxication apparently went untested. In his Stonehill appeal, Doe argued that "[t]he [i]nvestigators' failure to show that they had considered and weighed John Doe's explanation[s]" for the messages and why they nonetheless treated the messages as "damning admission[s]" "fell far short of their obligations as professional Title IX

investigators" and constituted procedural error.  See also Compl. ¶ 501.[35]

We agree that, in its treatment of Doe's Snapchat messages, the investigators' report plausibly reflects a failure to grapple with the complex credibility assessment presented by Doe's and Roe's conflicting accounts of the November 19th incident.[36]  Importantly, both parties agree that there was sexual

---

[35] In the breach-of-contract count of his complaint, Doe included "the investigators' failure to consider text messages and additional information" in a list of Stonehill's alleged breaches of "its duty to abide by its own policies and procedures and/or meet common standards of due process and provide fundamental fairness" -- an allegation that, viewed in Doe's favor, encompasses both the investigators' failure to consider his post-incident Snapchat messages in context and Dobrowski's failure to consider the Facebook Messenger messages submitted with his appeal.  Compl. ¶ 501.

[36] We note that Doe also has presented a view of his messages that could be seen as partially at odds with his assertion that he accepted responsibility simply to make Roe feel better.  He argues that the messages "are consistent with Doe having stimulated Roe after having received verbal or physical cues that manifested to him -- and would have manifested to a reasonable person in his place -- that Roe had consented," but then "becoming concerned that Roe was no longer confirming her continuing consent and may have withdrawn it."  Appellant's Br. at 48; see also Compl. ¶ 73 ("Both Snapchat messages were consistent with John Doe's knowledge that . . . she had consented and wanted him to begin and continue.").  According to Doe, while the messages show that he "tried to placate" Roe once he understood that she was accusing him of nonconsensual contact, they do not show that he knew he lacked consent at the time -- "the legal standard the investigators were required to address."  Appellant's Br. at 49.

Doe does not allege in his complaint that he explained his messages in this way to the investigators.  Regardless, the flaw Doe alleges is the investigators' failure to demonstrate that they considered his explanation for his messages, which may have led

contact on November 19.  Doe admits that he was lying beside Roe, on her bed, and that he began to digitally stimulate her without express verbal consent -- as he had done on three occasions in the past when Roe acknowledged the activity was consensual.  Both agree that the encounter ended when Roe began breathing heavily.  The remaining circumstances surrounding the November 19th encounter, however, are hotly disputed.

Hence, aside from the Snapchat messages -- and the belatedly reported exchange between Roe and Witness #2 -- the allegations in this case present a classic "he said, she said" scenario.  The preponderance of the evidence standard calls for a weighing of the competing evidence.  Inescapably, the investigators' failure in their report to explicitly assess Doe's explanation for his Snapchat messages suggests a deficiency in the weighing of the competing evidence that plausibly may have affected both the finding of a violation and, as discussed below, the decision of Stonehill's administrators to expel Doe.[37]

---

them to conclude improperly in their report "that [he] understood that the sexual interaction with [Roe] was unwanted."

[37] The significance of the Snapchat messages to the district court's assessment of Doe's claims cannot be overstated.  The court noted that the definition of consent in Stonehill's policy "might admit the possibility that a reasonable person could conclude consent had been given even if the other party did not so intend." Stonehill Coll., 2021 WL 706228, at *11.  However, the court rejected the plausibility of that possibility in this case "in the face of Roe's contemporaneous assertions (e.g., that 'wasn't consensual') and Doe's contemporaneous admissions (e.g., that 'I know I fucked up' and that 'I totally misread the situation'),

- 44 -

We thus conclude that Doe has plausibly alleged a breach of Stonehill's promise to conduct a fair and thorough investigation, compromising his defense, based on the four flaws we have described in the investigators' gathering and presentation of the facts.

### (d) Independent Review

Pursuant to Stonehill's policy, the investigators' final report was submitted to AVPSA Piskadlo, who was obliged to "determine if the facts gleaned in the investigation do indeed align with the findings offered by the [i]nvestigator[s]" before "issu[ing] a formal decision in the matter." Based on this provision, Doe could reasonably expect that Piskadlo -- as Stonehill's primary decisionmaker -- would independently review the facts presented in the investigators' final report to assess the correctness of their findings. Yet, as Doe alleges, see Compl. ¶¶ 388, 396, 414(a), 501, Piskadlo's letter informing Doe that he has been dismissed from Stonehill appears to state only the investigators', not Piskadlo's own, conclusion:

> I reviewed the completed report and recommendation from the Title IX [i]nvestigation, and based on the totality of the evidence presented, including all statements and exhibits, the investigators found that it is more likely than not that [Doe] assaulted [Roe] on the night in question. It was determined that [Roe] had

both of which are alleged by Doe." Id.; see also id. (referring to Doe's "contemporaneous admissions of misconduct").

- 45 -

> not consented to sexual penetration and that
> the messages sent by [Doe] to [Roe] after the
> incident indicated that [Doe] understood that
> the sexual interaction was unwanted as well.

(Emphasis added.)[38]

Piskadlo's facial deference to the investigators supports Doe's allegation that Piskadlo failed to make an independent determination that the sexual misconduct finding was supported by a preponderance of the evidence. See, e.g., Compl. ¶¶ 414(a), 501. In addition, the letter's seeming reliance solely on the investigators' conclusion supports an inference that the deficiencies in the investigative process were carried forward into the administrative review. Doe raised the inadequacy of Piskadlo's review in his appeal to Dobrowski, the Vice President for Student Affairs, arguing, inter alia, that Piskadlo's duties "logical[ly]" required him to "issue a decision demonstrating that

---

[38] In his complaint, Doe noted that

> [t]he Dismissal Letter did not contain any discussion of Piskadlo's review and determination of the evidence. In fact, it did not even clearly state that Piskadlo, himself, held an opinion on the Title IX [i]nvestigators' findings and recommendation of responsibility. Instead, Piskadlo merely repeated the Title IX [i]nvestigators' findings.

Compl. ¶ 396; see also id. ¶ 388 (noting that, "[a]lthough Piskadlo made it clear to John Doe that the Title IX [i]nvestigators had found him 'responsible,' Piskadlo did not explain why he, himself, had found that John Doe was responsible").

he has met his review obligations" and that his letter provided no such assurance.

Nonetheless, in response to Doe's lengthy memorandum requesting an appeal, Dobrowski stated without elaboration that she had "determined that the [i]nvestigators' process was compliant with our policy." Her one-page letter[39] explained that her role in the appeals process was to consider two factors: (1) whether there was a "[f]ailure to follow the process or procedures outlined within [Stonehill's] policy, which resulted in significant prejudice such that it impacted the outcome," and (2) whether there was "[n]ew information that was not known to the parties at the time of the investigation."[40] Dobrowski stated that, "[h]aving reviewed your request and the investigative

---

[39] Dobrowski first told Doe in a telephone conference call, in which his attorney and Stonehill's attorney also participated, that his appeal had been denied. Doe subsequently received the one-page letter reiterating the denial of his appeal and affirming his dismissal from the college.

[40] Stonehill's policy provides that an appeal from the decision in a misconduct investigation "will be considered based on the following criteria:"

> 1. Failure to follow the process or procedures outlined within this [p]olicy, which resulted in significant prejudice such that it impacted the outcome. Minor deviations from designated procedures will not be the basis for sustaining an appeal unless significant prejudice results.
>
> 2. New information that was not known to the parties at the time of the investigation.

- 47 -

report, I did not find sufficient reasoning to meet either criteria for appeal."

In his complaint, Doe notes that Dobrowski's letter did not specifically acknowledge or rule on his contention that Piskadlo, like the Title IX investigators, "had failed to comply with standards and processes" set forth in Stonehill's sexual misconduct policy. Compl. ¶ 423. Doe further asserts that Dobrowski declined to explain her reasoning on the advice of Stonehill's counsel. Id. ¶ 417. Doe alleges that, with her letter, Dobrowski ratified and approved "the investigation, evaluation, adjudication, and resolution of the charge against John Doe[,] including, in particular, the actions of the Title IX investigators and the AVPSA." Id. ¶ 433.

These allegations plausibly suggest that Piskadlo failed to make an independent judgment on whether "the facts gleaned in the investigation do indeed align with the findings offered by the [i]nvestigator[s]" and that Dobrowski, in turn, disregarded that procedural irregularity (among the others raised by Doe). The lack of an independent judgment by Stonehill's decisionmakers would be incompatible with the explicit terms of Stonehill's policy and the promise of a fair and thorough investigation. Moreover, the administrators' alleged failure to properly scrutinize the investigative process and ensure the validity of the

- 48 -

investigators' finding is a contractual breach that plainly supports an inference of prejudice to Doe.

**(e) Other Alleged Procedural Flaws**

In his complaint and briefing, Doe alludes to additional ways in which Stonehill allegedly breached his reasonable expectations in its handling of his case. As indicated above, we decline to address most of these allegations, as they are unsupported by the policy provisions on which Doe relies, belied by the facts alleged in his complaint, or insufficiently developed. See, e.g., Plazzi v. FedEx Ground Package Sys., Inc., 52 F.4th 1, 7 (1st Cir. 2022). We briefly address only Doe's contention that he was denied his right to an "iterative" inquiry, including an ability to cross-examine Roe.

In support of this contention, Doe directs us to Haidak v. University of Massachusetts-Amherst, 933 F.3d 56 (1st Cir. 2019), which describes an iterative inquiry as one where the "questioning of the complainant 'was informed' by the respondent's testimony." Appellant's Reply Br. at 6 (quoting Haidak, 933 F.3d at 70). However, Doe identifies no language in the policy, beyond the college's commitment to "thoroughness," that suggests a right to cross-examination or other specific elements of an iterative process, and we have found none. Moreover, his complaint indicates that the investigators took several steps that Doe identifies as characteristic of an "iterative" investigation: they "posed

- 49 -

questions to [Roe] based on [Doe]'s assertions," Compl. ¶ 299, and they permitted both parties to review Part 1 of the report and submit additional information, see id. ¶ 333.  To be sure, we have identified flaws in the execution of Stonehill's process.  But a commitment to "thoroughness" does not imply the use of a specific investigative model, and Doe's expectations to the contrary are not reasonable.

### (f) Reasonable Expectations: Summary

We conclude that Doe has plausibly alleged that Stonehill breached his reasonable expectations by denying him the opportunity to review all relevant facts before the final report was sent to the AVPSA, failing to provide advance notice of Roe's second interview, failing to perform a fair and thorough investigation in the ways particularized herein, and failing to ensure that the ultimate decisionmakers independently reviewed the facts to assess whether he "more likely than not" engaged in nonconsensual intercourse with Roe.  In so concluding, we emphasize that a court evaluating a motion to dismiss must take an indulgent view of the alleged facts.  We must "accept as true all well-pleaded facts alleged in the complaint" and draw all plausible inferences from the complaint's allegations in the plaintiff's favor.  Legal Sea Foods, LLC v. Strathmore Ins. Co., 36 F.4th 29, 34 (1st Cir. 2022) (quoting Alston v. Spiegel, 988 F.3d 564, 571 (1st Cir. 2021)).  Hence, to defeat dismissal of his contract

claim, Doe must only plead facts giving rise to a plausible inference that his reasonable expectations were not met because Stonehill strayed from the promises made in its sexual misconduct policy in ways that harmed his defense and affected the outcome.

We have concluded that Doe has met this requirement with the flaws we have identified. Moreover, even if one or more of those irregularities might be viewed in isolation as a "minor deviation[] from designated procedures" without impact on the outcome of the Title IX investigation,[41] Doe has plausibly alleged that, at least cumulatively, they had such an effect.

We note that, in reaching this conclusion, we necessarily disagree with the district court's statement, echoed by Stonehill, that Doe's complaint itself "arguably alleges he violated the policy." Stonehill Coll., 2021 WL 706228, at *11. In making this observation, the district court cited paragraph 58 of Doe's complaint, in which Doe describes the beginning of the November 19th incident as follows:

> Jane Roe then returned to her bed and lay down
> next to John Doe. In the same way he had on
> earlier occasions, he began to rub her back
> and then moved his hand to her vagina and began
> to digitally stimulate her. She began to make

---

[41] This "minor deviation" language in Stonehill's policy applies only to the standard for appeals within the college. See supra note 40. Nonetheless, that standard -- requiring that any challenged procedural flaw affect the outcome of a Title IX investigation -- also provides an apt formulation for assessing the viability of Doe's breach-of-contract allegations under Massachusetts law.

> moaning noises which, based on their prior sexual interaction, John Doe knew meant she was experiencing intense pleasure. When John Doe stopped, Jane Roe rolled onto her back and made her vagina more accessible to him. Based on their prior sexual interaction, John Doe believed that Jane Roe did this deliberately in order to make it easier for him to continue stimulating her.

Compl. ¶ 58. As reproduced above, Stonehill's policy defines consent as "informed, freely, and voluntarily given agreement, communicated by clearly understandable words or actions, to participate in each form of sexual activity." The policy further states that "[p]revious sexual relations . . . is not the equivalent of consent to future sexual activity."

Paragraph 58 does not rely on the fact that Doe and Roe previously engaged in consensual sexual activity to justify Doe's assumption that he had Roe's consent on November 19. Rather, the paragraph reports circumstances on November 19 that Doe claims resembled the beginning of their earlier consensual episodes, thus demonstrating why he believed he had consent on the fourth occasion. Doe admits that on the prior occasions he digitally stimulated Roe based on her "physical cues" before asking for permission to continue. It is debatable whether the physical cues on which Doe relied on those earlier occasions satisfied Stonehill's requirement that consent be "communicated by clearly understandable words or actions." But Roe concedes that the earlier encounters, involving similar details to Doe's report of

- 52 -

what occurred on November 19, were consensual. Hence, this paragraph does not contradict Doe's allegation that he understood Roe's behavior on November 19, as described in the paragraph, to likewise manifest consent -- and certainly does not constitute an admission to violating Stonehill's policy.[42]

## 2. Basic Fairness

Under Massachusetts law, in examining an asserted breach of contract based on a school's handling of an allegation of sexual misconduct against a student, we must also consider whether the proceedings were conducted with basic fairness. Cloud, 720 F.2d at 725. The basic fairness requirement appears chiefly concerned with whether the school "act[ed] in good faith and on reasonable grounds." Coveney v. President & Trs. of Coll. of Holy Cross, 445 N.E.2d 136, 139 (Mass. 1983). When, as here, "a school expressly promises no less than basic fairness . . . the court's analysis to ensure that the disciplinary proceedings were 'conducted with

---

[42] The district court correctly observed that the circumstances on November 19, as alleged by Doe, were not identical to his description of the earlier instances of sexual activity. See Stonehill Coll., 2021 WL 706228, at *8 n.6. For example, rather than removing her clothing, as occurred in their first encounter, Roe changed her clothing after Doe arrived in her room on November 19. See Compl. ¶ 57 ("Jane Roe . . . told John Doe that she was cold and rose from the bed, removed her t-shirt in front of him . . . and put on a tank top and a fleece pullover."). However, Doe alleges that on both the first occasion and on November 19, Roe moved toward him in a way that made "her vagina more accessible to him," id. ¶¶ 38, 58, and that on the other two occasions she responded with "the same physical cues" as she had given the first time, id. ¶¶ 41, 44.

basic fairness' . . . focuses on assuring compliance with the express contractual promise." Bos. Coll. I, 892 F.3d at 88 (quoting Cloud, 720 F.2d at 725).

We recently observed that, while the "denial of basic fairness is a recognized theory of recovery [in Massachusetts], the precise contours of such a claim are yet to be clearly defined." Sonoiki, 37 F.4th at 714. We have few relevant cases to draw from. In one prior case addressing the "basic fairness" test, we focused on whether the educational institution provided adequate procedural protections for the student. See Doe v. Trs. of Bos. Coll., 942 F.3d 527, 534-35 (1st Cir. 2019).[43] In another case, we considered whether certain aspects of the disciplinary process rendered the proceedings "unfair," but concluded that none did. Cloud, 720 F.2d 725-26. Similarly, Massachusetts caselaw provides few examples of what might constitute a breach of basic fairness. See, e.g., Schaer, 735 N.E.2d at 380 (finding that allegations concerning the "improper admission of testimony" and that "the hearing was conducted in an atmosphere of 'hysteria and misinformation'" did not establish a breach of basic fairness);

_____

[43] Similarly, the district court found no violation of the basic fairness requirement because the complaint indicated that Doe "was provided a variety of procedural protections" and that "he was able to explain his side of the story, review the facts section of the report, meet with the investigators, and request follow-up questions or interviews." Stonehill Coll., 2021 WL 706228, at *14.

- 54 -

Roe v. Northeastern Univ., No. 16-03335-C, 2019 WL 1141291, at *14 (Mass. Super. Ct. Mar. 8, 2019) (stating that "notice to [the student under investigation] is -- as a matter of fundamental fairness inherent in any college process -- essential prior to [a] hearing and any related appeal").

However, we need not define the precise contours of the basic fairness analysis here for a simple reason: Stonehill made a "commitment" in its sexual misconduct policy to "[e]ngag[e] in an impartial, prompt, fair, and equitable investigative process to resolve reports of sexual gender-based misconduct," (emphasis added), and we have concluded that Doe has adequately alleged procedural irregularities that may have resulted in prejudice to his defense and, hence, affected the outcome of the misconduct inquiry.  Whatever else the requirement of "basic fairness" means, we cannot reconcile plausible allegations of prejudicial investigative flaws with Stonehill's commitment to provide a "fair" process.

We thus conclude that Doe has stated a breach-of-contract claim under both theories available to him under Massachusetts law.

**B.  Title IX**

Title IX provides that "no person . . . shall, on the basis of sex, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance."  20

- 55 -

U.S.C. § 1681(a). A claim of sex bias in the enforcement or design of a college's sexual misconduct policy may state a claim under Title IX. See, e.g., Bos. Coll. I, 892 F.3d at 89-90. It is undisputed that Stonehill receives federal financial assistance and is thus covered by Title IX.

We have not set forth a single test for analyzing this type of Title IX claim, see Bos. Coll. I, 892 F.3d at 90, and have, instead, recognized several ways in which a plaintiff may establish sex discrimination. The two theories discussed by the district court that we consider most pertinent to Doe's Title IX allegations are "selective enforcement" and "erroneous outcome."[44]

To succeed with a "selective enforcement" claim under Title IX, a plaintiff must demonstrate that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Haidak, 933 F.3d at 74 (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)). A plaintiff

_____

[44] Some courts have framed the Title IX query in terms that more closely track the statutory language: "'[D]o the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] "on the basis of sex"'?" Doe v. Samford Univ., 29 F.4th 675, 686 (11th Cir. 2022) (second alteration in original) (quoting Doe v. Purdue Univ., 928 F.3d 652, 667-68 (7th Cir. 2019)); see id. (listing other circuits that have adopted the Purdue University approach). The Eleventh Circuit in Samford University slightly modified the Purdue University inquiry, asking "whether the alleged facts, if true, permit a reasonable inference that the university discriminated against Doe on the basis of sex." Id. at 687. Here, we choose to use the frameworks most applicable to Doe's specific contentions that also were discussed by the district court and the parties.

relying on an "erroneous outcome" theory must allege facts "'cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,' and indicating that 'gender bias was a motivating factor.'" Bos. Coll. I, 892 F.3d at 90 (alteration in original) (quoting Yusuf, 35 F.3d at 715).[45] Such facts may take the form of "particular evidentiary weaknesses[,] . . . particularized strengths of the defense," or "particular procedural flaws affecting the proof." Yusuf, 35 F.3d at 715.

### 1. Selective Enforcement

The district court dismissed Doe's selective enforcement claim because it found he "ha[d] not plausibly alleged any facts [suggesting] that his proceeding was initiated because of his gender, or that male and female students accused of sexual misconduct are treated differently" by Stonehill. Stonehill Coll., 2021 WL 706228, at *6. The court explained that Doe cited no facts "suggesting anything other than that Stonehill responds to the complaints it receives, regardless of the genders of the parties involved." Id. We agree with the district court's analysis.

To support his selective enforcement theory, Doe's complaint alleges that "in virtually all cases of alleged sexual

---

[45] As illustrated above, despite Title IX's language prohibiting discrimination "on the basis of sex," 20 U.S.C. § 1681(a), courts sometimes refer to "gender bias" when describing the prohibited motivation.

misconduct at Stonehill, the accused student is a male and the accusing student is a female," Compl. ¶ 480, and he further alleges, "on information and belief, [that] a female student at Stonehill has never been disciplined, much less expelled, for alleged sexual misconduct," id. ¶ 481. As the district court pointed out, we rejected a similar argument in Doe v. Trustees of Boston College, where the plaintiffs argued that the college's disciplinary procedures were "infected with systemic gender bias" because, during a ten-year period, "only male students have been accused of sexual assault." Bos. Coll. I, 892 F.3d at 90-92. We explained that "[i]t is unreasonable to draw such an inference [of sex bias] from this information rather than recognize that other non-biased reasons may support the gender makeup of the sexual misconduct cases" at the college. Id. at 92; see also Doe v. Brown Univ., 43 F.4th 195, 207 (1st Cir. 2022) (noting a study showing that "[m]ore women lodge complaints of sexual misconduct by men than vice versa"). Likewise, Doe alleges no facts that plausibly support an inference that Stonehill imposes more severe penalties for sexual misconduct on men than on women. Rather, he alleges that Piskadlo informed him "that Stonehill had only one sanction for the offense of 'nonconsensual sexual intercourse' -- immediate dismissal from Stonehill" -- and that "dismissal was always imposed irrespective of the [specifics of the] accused student's conduct." Compl. ¶ 389. The allegation that Stonehill consistently applies

the same punishment for a particular type of misconduct does not demonstrate differential treatment based on sex.

Without being able to rely on the assertion that the accused students are virtually all male, Doe is left with a bare assertion of selective enforcement unsupported in any other way. We need not accept allegations "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." Saccoccia, 955 F.3d at 174 (quoting Starr Surplus Lines Ins. Co. v. Mountaire Farms Inc., 920 F.3d 111, 114 (1st Cir. 2019)). Thus, we conclude that Doe has not plausibly alleged a selective enforcement claim.

### 2. Erroneous Outcome

To plausibly assert an erroneous outcome claim, Doe must allege facts that both cast articulable doubt on the result of his disciplinary proceedings and indicate that his sex was a motivating factor in the outcome. Bos. Coll. I, 892 F.3d at 90. The district court concluded that Doe's complaint failed to meet either requirement. We disagree that Doe's complaint fails to plausibly allege articulable doubt, but we nonetheless agree that Doe's Title IX claim fails because he has not plausibly alleged that the flaws in his disciplinary proceedings are attributable to sex bias. We explain our conclusion for each prong below.

**(a) Articulable Doubt**

As described above, Doe asserts numerous procedural flaws in Stonehill's investigation that he claims undermine the validity of its outcome: the investigators' inclusion of the "it's not ok" exchange between Roe and Witness #2 in the final report without having provided Doe the opportunity to challenge or investigate its provenance or veracity; the failure to give Doe advance notice of Roe's second interview; the failure to question Roe closely on the details of the November 19th incident or corroborate her statement that she was heavily intoxicated on the night of November 19, while minimizing her mischaracterization of her prior sexual relationship with Doe; the investigators' failure to provide a rationale in their report for rejecting Doe's explanation for his apologetic Snapchat messages; and the seemingly superficial review of the investigators' report by Piskadlo and Dobrowski. We agree that, when considered together, the procedural irregularities plausibly cast articulable doubt on the investigators' finding, adopted by Stonehill, that "it is more likely than not" that Doe violated Stonehill's sexual misconduct policy.

**(b) Sex Bias**

We next consider whether Doe adequately alleged facts suggesting "a causal connection between the outcome of [his] disciplinary proceedings and gender bias." Bos. Coll. I, 892 F.3d

- 60 -

at 91.[46]  In evaluating claims of sex bias, courts have deemed relevant both serious flaws in the disciplinary proceedings and external pressure on schools to vigorously pursue claims of sexual misconduct.  See infra.  Doe's complaint alleges that both factors exist in his case and support a plausible inference that sex bias affected the outcome of his disciplinary proceedings.

We agree with other courts that procedural irregularities may be relevant in identifying sex discrimination under Title IX.  See, e.g., Doe v. Regents of Univ. of Cal., 23 F.4th 930, 940 (9th Cir. 2022); Doe v. Oberlin Coll., 963 F.3d 580, 586-87 (6th Cir. 2020); Menaker v. Hofstra Univ., 935 F.3d 20, 31 (2d Cir. 2019).  We also are mindful, however, that procedural errors are not inevitably a sign of sex bias.  See, e.g., Doe v. Univ. of So. Ind., 43 F.4th 784, 797 (7th Cir. 2022) (noting that an inference of sex bias may be unsupportable when the plaintiff alleges a host of "procedural choices that could

_____

[46] Doe urges us to adopt the pleading standard for Title IX cases articulated by the Second Circuit in Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016), in which the court stated that a plaintiff must allege facts showing "a minimal plausible inference" of sex discrimination.  Id. at 55.  Although Doe summarily suggests that the Second Circuit's standard is less demanding than the pleading standard we ordinarily apply when evaluating a motion to dismiss, he does not explain how it would -- or should -- differ in application from our obligation to draw all plausible inferences in the plaintiff's favor and our recognition that the plaintiff's burden at the motion to dismiss stage is a relatively light one.  We therefore decline to delve into this issue.  See Plazzi, 52 F.4th at 7 (deeming waived an argument that plaintiffs did not adequately develop on appeal).

arguably be considered mistakes").  The challenge is to distinguish between proceedings plausibly affected by sex bias in violation of Title IX and proceedings whose alleged flaws are not attributable to sex bias.  Id. at 793-94.  For example, other plausible reasons for procedural irregularities may include "ineptitude, inexperience, and sex-neutral pro-complainant bias."  Doe v. Samford Univ., 29 F.4th 675, 692 (11th Cir. 2022).

Here, although we have identified potentially serious flaws in Doe's disciplinary proceedings, Doe has failed to plead sufficient facts to support a plausible inference that the irregularities are attributable to sex bias.  To be sure, the facts as alleged may plausibly suggest undue solicitude to Roe.  But deference to Roe, without more, does not show that her treatment -- or Doe's -- is attributable to sex rather than to some other reason, such as Roe's status as the complainant.  Beyond his unsupported allegation that Stonehill penalizes men for sexual misconduct more severely than women, Doe does not allege that Stonehill has treated sexual assault claims brought by men differently from such claims brought by women.  His allegation that "[s]tudents accused of sexual misconduct at Stonehill . . . have invariably been male," which he asserts "on information and belief," Compl. ¶ 478, fails to show sex bias in the investigation for the same reason that his selective enforcement claim fails -- i.e., the disparity in the number of claims brought by men and

women does not demonstrate that Stonehill's procedures are generally biased against men or that the outcome of Doe's proceedings was motivated by his sex.

Importantly, even with the serious alleged flaws we have identified, the disciplinary process in this case was not as inexplicably and egregiously one-sided as in cases where courts have concluded that the allegations supported a plausible inference of sex bias. In Doe v. Columbia University, for example, the plaintiff alleged that the accusing student's claim of nonconsensual intercourse was unsupported by any evidence and that the university "declined even to explore the testimony of [his] witnesses." 831 F.3d 46, 57 (2d Cir. 2016); see also Doe v. Purdue Univ., 928 F.3d 652, 657-658, 669 (7th Cir. 2019) (noting, among other circumstances, that the accused student was denied permission to present witnesses when he met with the advisory panel tasked with making a recommendation on the case; the complainant did not appear at that meeting and "did not even submit a statement in her own words"; and the Dean of Students described the complainant as "a credible witness" even though she had never spoken with her); Univ. of So. Ind., 43 F.4th at 794 (listing and describing cases in which "[t]he plaintiff alleged what amounted to a sham grievance process"). Doe was given a meaningful opportunity to present his version of what occurred. The investigators requestioned Roe after hearing Doe's side of the

story and, albeit inadequately, they noted in their final report that she initially gave an inaccurate description of their prior sexual activity. Hence, although Doe has plausibly alleged contractual breaches that may have harmed his defense, Stonehill's conduct was not so egregious that -- absent any other indicators of sex bias -- it alone supports an inference that the college was motivated to discipline him because of his sex.

Doe alleges that external pressures on Stonehill also are relevant in assessing the adequacy of his Title IX claim and, in combination with the procedural flaws, give rise to a plausible inference of sex bias. We agree with the consensus among the circuits that pressure from a federal investigation into a school's handling of sexual misconduct cases can "establish background indicia of sex discrimination." Schwake v. Ariz. Bd. of Regents, 967 F.3d 940, 949 (9th Cir. 2020); see also Doe v. Univ. of Ark.-Fayetteville, 974 F.3d 858, 865 (8th Cir. 2020) (citing the relevance of "[e]xternal pressure on a university" to demonstrate that it was acting vigorously in response to complaints by female students); Doe v. Univ. of Scis., 961 F.3d 203, 209-10 (3d Cir. 2020) (same); Doe v. Univ. of Denver, 952 F.3d 1182, 1192-93 (10th Cir. 2020) (same); Purdue Univ., 928 F.3d at 668-69 (same); Doe v. Baum, 903 F.3d 575, 586-87 (6th Cir. 2018) (same); cf. Columbia Univ., 831 F.3d at 57-58 (citing pressure from the student body and the public). Such an inquiry, when initiated by the Office of

Civil Rights ("OCR") of the Department of Education ("DOE"), has been found relevant in Title IX cases based on the plausible inference that a school would fear the loss of federal funding "if it could not show that it was vigorously investigating and punishing sexual misconduct." Purdue Univ., 928 F.3d at 668; see also, e.g., Doe v. Miami Univ., 882 F.3d 579, 594 (6th Cir. 2018) (considering, among other factors, the external pressure on the university because of the "potential . . . loss of all federal funds").

Relying on this precedent, Doe alleges that several complaints about Stonehill's handling of sexual misconduct allegations on campus were pending in the OCR as of March 2016, and he alleges that Stonehill was still under the scrutiny of the OCR eighteen months later when the incident with Roe occurred. He asserts that, because of the OCR inquiry and the emergence of the #MeToo movement in the fall of 2017, the college "felt pressure to expedite the investigation and find a male student responsible for sexual misconduct." Compl. ¶ 209. Doe also cites publicity in March 2016 "related to th[e OCR] investigations." Id. ¶ 492.[47]

---

[47] The Title IX count of Doe's complaint includes the allegation that "the very recent #METOO movement, and the DOE's pending investigations against Stonehill, and the publicity related to those investigations, all contributed to the discriminatory conduct of Stonehill in its[] investigation, determination of wrongdoing, and sanctioning of John Doe." Compl. ¶ 492.

In our view, however, the link Doe attempts to draw between these background factors and his disciplinary proceedings is too weak to create a plausible inference that sex bias played a role in how the process unfolded.[48] The Second Circuit's decision

The record contains two March 2016 articles about the DOE investigation into Stonehill's handling of an alleged sexual assault. One article quotes an OCR "compliance team leader" as saying that the OCR would be investigating whether Stonehill had "failed to respond promptly and equitably to reports and/or incidents of sexual violence of which it had notice." Cody Shepard, "Feds investigating Stonehill College for handling of sexual assaults," The Enterprise (Mar. 15, 2016), https://www.wcvb.com/amp/article/feds-investigating-stonehill-college-for-handling-of-sexual-assaults/8232745 (last visited Dec. 10, 2022).

[48] Our court has only once previously considered allegations of external pressure on an educational institution in the context of a Title IX claim. We concluded, at the summary judgment stage, that appellants' reliance on Boston College's receipt of a 2011 "Dear Colleague Letter" was "conclusory and meritless" because they did not "explain[] how the Dear Colleague Letter reflects or espouses gender bias." Bos. Coll. I, 892 F.3d at 92. The DOE has distributed guidance on various Title IX requirements to educational institutions in the format of "Dear Colleague" letters. See, e.g., Letter from Russlynn Ali, Ass't Sec'y for Civ. Rts., U.S. Dep't of Educ. (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. As we have observed, the 2011 Letter "tied federal funding for private colleges to their compliance with certain requirements for handling sexual harassment and sexual violence on their campuses." Bos. Coll. I, 892 F.3d at 91. Courts have found the 2011 Letter relevant to the plausibility of a Title IX claim because of the "accompanying pressure" to comply. Purdue Univ., 928 F.3d at 669.

Doe does not allege pressure on Stonehill from the 2011 Letter, which -- as he recognizes -- was withdrawn in 2017. In its 2017 Dear Colleague Letter, the DOE noted that "[l]egal commentators ha[d] criticized the 2011 Letter and [a 2014 Q&A document] for placing 'improper pressure upon universities to adopt procedures that do not afford fundamental fairness to students accused of sexual misconduct.'" Letter from Candice

in <u>Doe</u> v. <u>Columbia University</u> again provides a relevant contrast. There, contemporaneously with the plaintiff's disciplinary proceedings, there was an outcry on campus denouncing the university's handling of sexual assault claims brought by women, <u>see</u> 831 F.3d at 50-51, and, two months earlier, an article about the controversy appeared in the <u>New York Post</u>, <u>id.</u> at 50. The university's president had promised to hold a town hall meeting on the issue around the time of the plaintiff's hearing, and just a few weeks earlier, a student newspaper specifically criticized the university's Title IX investigator for inadequately investigating sexual assault complaints. <u>Id.</u> at 51; <u>see also id.</u> at 58 (noting "the [c]omplaint's suggested inference that the [disciplinary] panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults"). Similarly, in <u>Doe</u> v. <u>Purdue University</u>, the Seventh Circuit stated that an inference of sex bias was strengthened by the fact that, during the month of the plaintiff's discipline, an article from <u>The Washington Post</u> titled "Alcohol isn't the cause of campus sexual assault. Men are," 928 F.3d at 669, was added to the Facebook page of a university center

Jackson, Acting Ass't Sec'y for Civ. Rts., U.S. Dep't of Educ. (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

"dedicated to supporting victims of sexual violence," id. at 656;

see also id. at 669 ("Construing reasonable inferences in [the

plaintiff's] favor, this statement, which [the center] advertised

to the campus community, could be understood to blame men as a

class for the problem of campus sexual assault rather than the

individuals who commit sexual assault.").

Here, by contrast, Doe relies primarily on the DOE

inquiry that was publicized in March 2016 -- nearly two years

before the Title IX investigators submitted their final report in

his case.[49] He cites no contemporaneous attention to the issue on

campus or in the press, and he does not allege that any Stonehill

representative involved in his case was targeted for specific

criticism for mishandling sexual assault complaints. Nor does

Doe's bare invocation of the #MeToo movement, absent some facts

---

[49] Doe also alleges that an inference of sex discrimination
arises from the fact that Stonehill has separate procedures for
general student misconduct and sexual misconduct. He premises
that assertion on a Q&A document issued by the DOE in 2017 stating
that, "[w]hen a school applies special procedures in sexual
misconduct cases, it suggests a discriminatory purpose." Compl.
¶ 218 (alteration in original). However, we agree with the
district court that, read in context, the 2017 Q&A appears to be
addressing separate processes that have different burdens of
proof. See Stonehill Coll., 2021 WL 706228, at *4. It is
undisputed that Stonehill's misconduct policies uniformly use a
preponderance standard, and we therefore draw no inference from
Stonehill's use of separate procedures for sexual misconduct
allegations. We note, as an aside, that although Doe's complaint
alleges the violation of both policies, see, e.g., Compl. ¶ 423,
he develops no breach-of-contract argument premised on the general
student misconduct policy. We therefore consider any such argument
waived.

linking it to Stonehill's investigation and decision-making,[50] carry him over the plausibility threshold. The alleged pressure on Stonehill to vigorously pursue sexual assault claims at best gives rise to a plausible inference that Stonehill was motivated to validate any claims it received, but Doe offers no facts supporting an inference that the college's motivation differed for men and women.

We thus conclude that Doe has not adequately alleged a Title IX claim under either the selective enforcement or erroneous outcome theories. With respect to the latter, although his allegations suffice to plausibly suggest articulable doubt as to the outcome of the disciplinary proceedings, he has not plausibly alleged that sex bias played a role in motivating that outcome.

## C. Breach of Covenant of Good Faith and Fair Dealing

In Massachusetts, "[t]he covenant of good faith and fair dealing is implied in every contract." Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004). Doe makes a fleeting argument that the district court erred by treating his basic fairness claim and his good faith and fair dealing claim as

---

[50] Doe does allege that Roe was motivated by the #MeToo movement, asserting in his complaint that "this movement struck a chord with [her] because on October 20, 2017, she updated her status on her Facebook page in support of #METOO." Compl. at 2. But he does not allege that Stonehill was aware of her motivation or explain how her motivation influenced Stonehill in carrying out its investigation.

identical.  He does not explain, however, how the facts supporting the two claims differ.  As we have recently stated, "the denial of basic fairness concept is rooted in the implied promise of good faith and fair dealing, meaning the denial of basic fairness is the student disciplinary adjudications' version of claiming a breach of the implied covenant of good faith and fair dealing." Sonoiki, 37 F.4th at 716 (citation omitted).  Thus, as Doe does not identify a distinct basis for this claim, we affirm the district court's dismissal of it.  See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013) (affirming the dismissal of a duplicative claim). [51]

## D. Negligence and Negligent Infliction of Emotional Distress

To state a claim for negligence under Massachusetts law, one must allege that "the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage." Jupin v. Kask, 849 N.E.2d 829, 834-35 (Mass. 2006).  As we have explained, however, when school documents "prescribe [a] disciplinary process" that establishes a

---

[51] Doe's complaint also contains a separate count alleging that Stonehill breached the "common law duty of fairness."  Compl. ¶¶ 553-57.  Doe does not address this claim in his brief, and we cannot identify a "common law duty of fairness" in Massachusetts caselaw that is distinct from the covenant of good faith and fair dealing.  We therefore consider this additional claim waived and affirm the district court's dismissal of it.  See Abdisamad v. City of Lewiston, 960 F.3d 56, 59 (1st Cir. 2020).

contractual relationship with its students, the school does not owe "any additional independent duty [in tort] outside of their existing contractual relationship." Bos. Coll. I, 892 F.3d at 94. This principle also dooms Doe's negligent infliction of emotional distress claim because one must establish negligence to successfully set forth a claim for negligent infliction of emotional distress. See Galvin v. U.S. Bank, N.A., 852 F.3d 146, 161 (1st Cir. 2017).

The district court suggested that Doe's allegations of negligent supervision and training may fall outside the limitation for tort claims premised on contractually based disciplinary procedures. See Stonehill Coll., 2021 WL 706228, at *15 n.11. Even assuming that suggestion is correct, we agree with the district court that Doe's complaint fails to state a plausible claim of negligence rooted in negligent supervision or training. See id. at *15. To allege negligent supervision, "a plaintiff must show that the 'employer [became] aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fail[ed] to take further action such as investigating, discharge or reassignment.'" Helfman v. Northeastern Univ., 149 N.E.3d 758, 775 (Mass. 2020) (first alteration in original) (quoting Foster v. The Loft, Inc., 526 N.E.2d 1309, 1311 (Mass. App. Ct. 1988)). Doe argues, briefly, that Stonehill is liable for negligent supervision because

Krentzman, the Title IX Coordinator, "did not adequately train Bamford and Jordan," the investigators on Doe's case, and permitted "their woeful incompetence in the investigation and determination of responsibility." Doe does not allege with any specificity how Krentzman would have become aware of this alleged incompetence, and his brief on appeal does not point to any specific facts supporting this broad allegation.

Nor does he allege facts plausibly showing that the Title IX investigators or the reviewing officials, Piskadlo and Dobrowski, were not properly trained. Rather, his allegations suggest that they failed to act consistently with their training. See, e.g., Compl. ¶¶ 293 (referring to the training received by the Title IX investigators), 431 (referring to the training received by Dobrowski). Accordingly, we agree with the district court that Doe's negligence-based claims fail.[52]

## E. Defamation

Lastly, Doe argues that he was defamed by the concluding statement in the final report, which said, below the heading "Investigative Findings": "The Investigators determined that based on a preponderance of the evidence it is more likely than not that [Doe] violated Policy S1.14, specifically, non-consensual digital

---

[52] Because we find that Doe's negligent supervision claim was properly dismissed, we need not reach his argument that his intentional infliction of emotional distress claim may survive by reference to the supervision claim.

- 72 -

penetration of the vagina."[53]  The district court concluded that the statement was not defamatory because it "clearly represents the recommendation -- the opinion -- of the Title IX investigators after conducting the investigation and reviewing the full factual record."  Stonehill Coll., 2021 WL 706228, at *16.  In making this determination, the district court noted that the statement "is accompanied by cautionary language" and "is supported by disclosed, non-defamatory facts because it is accompanied by the full [f]inal [r]eport."  Id.

Statements of opinion are not actionable under Massachusetts defamation law.  Scholz v. Delp, 41 N.E.3d 38, 45 (Mass. 2015).  "Whether a statement is a factual assertion or an opinion is a question of law 'if the statement unambiguously constitutes either fact or opinion.'"  Id. (quoting King v. Globe Newspaper Co., 512 N.E.2d 241, 244 (Mass. 1987)).  The Supreme Judicial Court of Massachusetts has set forth factors to be considered in evaluating whether a statement may be deemed a statement of fact or of opinion as a matter of law:

> [T]he test to be applied . . . requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence.  In addition, the court must give weight to cautionary terms used by the person publishing

---

[53] In his complaint, Doe asserted that the final report and Dobrowski's letter denying his appeal "contained numerous false and defamatory statements," Compl. ¶¶ 528, 530, but he focuses solely on this statement on appeal.

the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.

Cole v. Westinghouse Broad. Co., 435 N.E.2d 1021, 1025 (Mass. 1982) (quoting Info. Control Corp. v. Genesis One Comput. Corp., 611 F.2d 781, 784 (9th Cir. 1980)).

We agree with the district court that the challenged statement, taken in context, is inarguably a non-actionable opinion. Stonehill's policy states that the investigators will prepare a report for the AVPSA that includes a "recommendation of responsibility." As the district court noted, the investigators' recommendation was accompanied in the report by the facts -- not themselves challenged as defamatory -- that supported the recommendation. See Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015) ("[T]he speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based."). The recommendation also was modified by the cautionary phrase "more likely than not." Hence, under Massachusetts law, the challenged statement is unambiguously an opinion that cannot support a defamation claim.

## F. Additional Claims

Given its dismissal of all substantive counts, the district court also dismissed the counts of the complaint seeking a declaratory judgment, permanent injunction, and attorney's fees.

- 74 -

See <u>Stonehill Coll.</u>, 2021 WL 706228, at *17. Because we reverse the dismissal of Doe's breach-of-contract claim, we also reverse the dismissals of the counts seeking a declaratory judgment and permanent injunction. We affirm dismissal of the attorney's fees count, which was linked to Doe's Title IX claim.

### III.

For the reasons set forth above, we affirm the district court's dismissal of Doe's Title IX, covenant of good faith and fair dealing, common law duty-of-fairness, negligence, negligent infliction of emotional distress, and defamation claims, as well as his count seeking attorney's fees. We reverse the district court's dismissal of Doe's breach-of-contract claim, as well as the dismissal of the counts seeking a declaratory judgment and permanent injunction, and we remand the case to the district court for further proceedings on the plausible contractual breaches that we have identified.

We recognize that Doe has submitted a 569-paragraph complaint that broadly incorporates all of his allegations within each count. Given that most of Doe's claims have been dismissed, the district court may choose to require Doe to amend his complaint, or adopt other procedures, so that the court may efficiently resolve the remaining breach-of-contract claim.

<u>So ordered</u>. <u>No costs are awarded</u>.